UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

| | |
|---|---|
| COLE SEBASTIAN, Individually and on Behalf of All Others Similarly Situated,<br><br>    Plaintiff,<br><br>v.<br><br>KIA AMERICA, INC., and HYUNDAI MOTOR AMERICA,<br><br>    Defendants. | Case No.: 23-cv-230<br><br>**CLASS ACTION COMPLAINT**<br><br>**Jury Trial Demanded** |

## INTRODUCTION

1. Plaintiff brings this proposed class action for damages and injunctive relief on behalf of himself and all other persons and entities nationwide who purchased or leased 2011-2022 Kia vehicles or 2015-2022 Hyundai vehicles equipped with traditional "insert-and-turn" steel key ignition systems (the "Vehicles or "Class Vehicles") manufactured by defendant Kia America, Inc. ("Kia") or Hyundai Motor America ("Hyundai") (collectively, "Defendants"). Unlike most vehicles, the Class Vehicles are not equipped with an "immobilizer" preventing them from being started unless a code is transmitted from the Vehicle's specific smart key.

2. This security vulnerability (the "Defect") makes the Vehicles incredibly easy to steal, allowing thieves to steal Vehicles by simply opening the steering columns and using a common USB charging cord or similar metal object to start the engine.

3. Viral videos on TikTok and YouTube give step-by-step instructions on how to steal Class Vehicles without a key, and reports of stolen Kia and Hyundai Vehicles have skyrocketed across the country. In fact, the "Kia Challenge," widely shared on social media platforms, dares people to break in and then use a USB cord to start the cars. The videos show teens and young

adults going for joy rides and in some cases, even abandoning or crashing the cars. The incidents have turned dangerous, with suspects and bystanders being seriously injured or killed following unsafe driving and crashes related to the thefts.

4. Defendants have long known or should have known of the Defect from multiple sources. According to Police, thieves have been exploiting a security flaw in Kia vehicles made since 2011 and Hyundai vehicles made since 2015. Yet Defendants failed to disclose and actively concealed the Defect from the public, and continue to manufacture, distribute, and sell the Vehicles without disclosing the Defect.

5. Plaintiff brings this action for violation of relevant state consumer protection acts and for breach of implied warranties on behalf of a nationwide class and state classes of Vehicle lessees and owners. Plaintiff seeks damages and equitable relief on behalf of himself and all others similarly situated.

## **JURISDICTION AND VENUE**

6. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d)(2), as amended by the Class Action Fairness Act of 2005, because the amount in controversy exceeds $5,000,000, exclusive of interests and costs, and because this is a class action in which the members of the classes and Defendants are citizens of different states. This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

7. Venue is proper in this judicial district under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this district, and a substantial part of property that is the subject of the action is situated in this district.

## **PARTIES**

8. Plaintiff Cole Sebastian is a resident of Milwaukee, Wisconsin.

9. Plaintiff purchased a 2018 Kia Forte (the "Forte") (See https://cars.usnews.com/cars-trucks/kia/forte/2018) in or around May 2019, from Russ Darrow Kia of Waukesha, 2141 E Moreland Blvd., Waukesha, WI 53186.

10. Plaintiff's Forte is a Class Vehicle equipped with a defective security system that renders the vehicle easy to steal.

11. As discussed below, Plaintiff's Forte and the Class Vehicles are Kia and Hyundai vehicles with keyed ignitions.

12. Plaintiff Sebastian's Forte was stolen on the night of July 3, 2021, outside Plaintiff's friend's house at 1620 N Jackson St., Milwaukee, Wisconsin.

13. Plaintiff notified the Milwaukee Police Department about the theft immediately when he discovered his car was missing.

14. Milwaukee police recovered the Forte around 7:00 AM on July 4, 2021.

15. The Forte had been abandoned in an alley on around 43rd and Center St. in Milwaukee.

16. As far as Plaintiff knows, the thief or thieves have not been identified or arrested.

17. At the time police recovered the Forte, the back right window was broken open and the car's ignition was "ripped out." This damage is consistent with the methods described above to circumvent the lax security systems of the subject vehicles.

18. Plaintiff suffered actual damages as a result of the theft.

19. Aside from the damage to the window and ignition and temporary loss of use of the Forte, the thieves also damaged the Forte's front right quarter panel and bumper, presumably when the thieves crashed the Forte. Further, the front right wheel was also out of alignment after the Forte was recovered.

20. The thief or thieves also stole all of Plaintiff's work tools in the trunk of the Forte.

21. Upon information and belief, Plaintiff's Forte was targeted for theft because it is a Kia vehicle with a keyed ignition, which could be accessed through the window without setting off the alarm and which could be easily started and driven without a key because it lacked an immobilizer.

22. Plaintiff's Forte would likely not have been stolen if the class-wide defects were not present.

23. Defendant Kia America, Inc. is a California corporation with a principal place of business at 111 Peters Canyon Road, Irvine, California 92606.

24. Defendant Hyundai Motor America is a California corporation with a principal place of business at 10550 Talbert Avenue, Fountain Valley, California 92708.

## **FACTS**

10. Immobilizers have been proven to deter auto theft. Indeed, a 2016 study reflects that the use of immobilizers lowered the overall rate of car thefts by 40% over a ten-year period.

11. Recognizing the value of immobilizers as an anti–theft device, countries across the globe require immobilizers to be installed as standard equipment in new vehicles. For example, the European Union has required immobilizers as a standard feature for all new vehicles since 1998, Australia since 2001, and Canada since 2007.

12. Kia and Hyundai, however, have largely refused to implement immobilizers as standard technology in virtually all of their vehicle lines. Defendants have long been aware of the anti–theft benefits attendant to making immobilizers a standard feature on their vehicles based on the immobilizer mandates of other countries in which Kia and Hyundai sell their vehicles. Kia and Hyundai sell virtually identical vehicles to the Class Vehicles in countries with immobilizer

4

requirements, but have largely failed to equip Vehicles sold in the United States with the same immobilizer technology designed to prevent auto theft.

13. Kia and Hyundai likely refused to implement this technology as a standard feature in the Class Vehicles as a cost–saving measure to improve their profitability.

14. Given the ease with which Class Vehicles can be stolen, the United States has experienced a swell in reported car thefts of Vehicles. Indeed, in Milwaukee, two of the three vehicle makes accounting for nearly 60% of vehicle thefts are Kia and Hyundai.

15. The cost to repair stolen Vehicles can be substantial. The cost to repair a window and steering column on a Class Vehicle alone can exceed $3,000. Because cars taken on joy rides often experience further damage, the owner's total cost to repair their vehicle often exceed $10,000.

16. Moreover, due to the alarming rate in which Class Vehicles are being stolen, Defendants' authorized dealers and repair shops are experiencing shortages of the parts needed to repair them. Some parts are backordered up to eight weeks.

17. The federal government has long recognized that "stolen cars constitute a major hazard to life and limb on the highways." 33 Fed. Reg. 6, 471, (Apr. 27, 1968).

18. Moreover, "cars operated by unauthorized persons are far more likely to cause unreasonable risk of accident, personal injury, and death than those which are driven by authorized individuals." *Id*.

19. The rate at which these Vehicles are being stolen is so high that certain auto insurance companies are either refusing to insure these Vehicles or have raised the rates. The following statement from Progressive was recently released to ABC 7 News Denver:

We're committed to providing affordable insurance solutions for consumers based

5

on the particular level of risk while also ensuring our policies are accurately priced. Due to the theft risk that some Hyundai and Kia vehicles present, in many cases it makes these vehicles difficult to insure, so we have adjusted our acceptance criteria for new business on some of these models. We'll continue to monitor how this issue plays out, and are hopeful to be able to revisit our decision if the theft risk diminishes and community awareness improves.

20. Other harms caused by the auto theft include increased insurance premiums foisted upon the victims of these crimes, other property that is stolen or damaged in the process, and the diminution in value of the Class Vehicles being targeted.

21. Notably, the Vehicles fail to comply with Federal Motor Vehicle Safety Standard ("FMVSS") 114, which requires: "Each vehicle must have a starting system which, whenever the key is removed from the starting system prevents: (a) The normal activation of the vehicle's engine or motor; and (b) Either steering, or forward self-mobility, of the vehicle, or both."

22. If the Vehicles were manufactured to comply with this FMVSS, they would not be stolen at such alarming rates because when the key is removed from the starting system, both steering and forward self-mobility would be prevented.

23. Recognizing the gravity of the problem, Defendants have announced that all new model vehicles will be equipped with an immobilizer. But this change offers little consolation to the thousands of consumers whose defective Vehicles remain vulnerable to theft.

24. Defendants have long known the security benefits offered by immobilizers. Indeed, Defendants have been selling virtually identical vehicles equipped with immobilizers overseas for decades, and have even incorporated immobilizers as standard technology into select higher–end models, but Defendants have simply refused to follow their competitors by making it standard technology on their lower–cost brands.

25. The ease with which the Class Vehicles may be stolen is not surprising to

Defendants. Upon information and belief, Defendants have known of the unusually high rate of thefts experienced by Class Vehicles for many years, through scores of customer complaints relayed through their dealers.

26. Moreover, Defendants must have known how these Vehicles were being stolen because they sell replacement parts to dealerships and autobody shops around the country that are needed to repair the stolen Vehicles. Because the Vehicles are being stolen in the same way, Defendants would have experienced a spike in orders for the same replacement parts.

27. But Defendants continued to sell the Class Vehicles, flooding the market with more unsafe cars susceptible to theft. Only when the problem became too large to ignore did Defendants decide to introduce immobilizer technology to all future new vehicles going forward

28. Meanwhile, the Class members who have previously purchased the Vehicles remain vulnerable.

## CLASS ACTION ALLEGATIONS

29. Plaintiff brings this action on behalf of himself and all others similarly situated under Fed. R. Civ. P. 23.

30. Subject to confirmation, clarification and/or modification based on discovery to be conducted in this action, the classes that Plaintiff seeks to represent shall be defined as follows:

(i) All persons and entities nationwide that purchased or leased a Class Vehicle (the "Nationwide Class").

(ii) All persons and entities that purchased or leased a Class Vehicle in the State of Wisconsin (the "Wisconsin Class").

31. Excluded from the Class are: (1) Defendants, any entity in which Defendants have a controlling interest, and their legal representatives, officers, directors, employees, assigns and

successors; (2) the Judge to whom this case is assigned and any member of the Judge's staff or immediate family; and (3) Class Counsel.

32. Plaintiff seeks only damages and injunctive relief on behalf of himself and the Class members. Plaintiff disclaims any intent or right to seek any recovery in this action for personal injuries, wrongful death, or emotional distress suffered by Plaintiff and/or the Class members.

33. While the exact number of Class members is unknown to Plaintiff at this time and can only be determined by appropriate discovery, membership in the Class is ascertainable based upon the records maintained by Defendants and governmental officials. Upon information and belief, Defendants have sold and leased many thousands of Vehicles nationwide during the relevant time period. Therefore, the Class members are so numerous that individual joinder of all Class members is impracticable under Fed. R. Civ. P. 23(a)(1).

34. Common questions of law and fact exist as to all Class members. These common legal and factual questions include:

> (a) Whether Defendants designed, advertised, sold, and placed the Class Vehicles into the stream of commerce;
>
> (b) Whether the Class Vehicles were sold with the Defect described above;
>
> (c) Whether the Defect in the Class Vehicles is a safety and/or security defect that created a foreseeable risk of harm to Plaintiff and the Class;
>
> (d) Whether Defendants breached implied warranties made to the Class members;
>
> (e) Whether Defendants knew about the Defect and, if so, how long Defendants have known about the Defect;
>
> (f) Whether Defendants concealed the Defect;

(g) Whether Defendants' conduct violates consumer protection statutes, warranty laws, and other laws asserted herein;

(h) Whether the Class members have suffered damages as a result of the conduct alleged herein, and if so, the measure of such damages, including diminution of value and deprivation of the benefit of the bargain; and

(i) Whether the Class members are entitled to injunctive relief. Plaintiff' claims are typical of the claims of the Class members whom they seek to represent under Fed. R. Civ. P. 23(a)(3) because Plaintiff and each Class member have a Vehicle with the same Defect.

35. Plaintiff will fairly and adequately represent and protect the interests of the Class members as required by Fed. R. Civ. P. 23(a)(4). Plaintiff is an adequate representative because his interests do not conflict with the interests of the Class members. Further, Plaintiff has retained counsel competent and experienced in complex class action litigation, including automotive defect class action litigation, and Plaintiff intends to prosecute this action vigorously. Therefore, the interests of the Class members will be fairly and adequately protected.

36. A class action is appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law or fact common to Class members predominate over any questions affecting only individual members, and a class action is superior to any other available means for fairly and efficiently adjudicating the controversy. In this regard, the Class members' interests in individually controlling the prosecution of separate actions are low, given the magnitude, burden, and expense of individual prosecutions against large corporations such as Defendants. It is desirable to concentrate this litigation in this forum to avoid burdening the courts with individual lawsuits. Individualized litigation presents a potential for inconsistent or contradictory results and also

9

increases the delay and expense to all parties and the court system presented by the legal and factual issues of this case. By contrast, the class action procedure here will have no management difficulties. Defendants' records and the records available publicly will easily identify the Class members. The Defect is common to all Vehicles; therefore, the same common documents and testimony will be used to prove Plaintiff's claims as well as the claims of the Class members. Finally, proceeding as a class action provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

37. A class action is appropriate under Fed. R. Civ. P. 23(b)(2) because, as stated above, Defendants have acted or refused to act on grounds that apply generally to the Class members, so that final injunctive relief or corresponding declaratory relief is appropriate as to all Class members.

## COUNT I
## BREACH OF IMPLIED WARRANTY

38. Plaintiff re-alleges and incorporates each and every allegation set forth above as if fully written herein.

39. This count is brought on behalf of a Nationwide Class.

40. As detailed herein, Defendants designed, manufactured, distributed, and sold the Class Vehicles knowing that consumers like Plaintiff and the Class would purchase these products from Kia and Hyundai's authorized dealers as a means of transportation.

41. As merchants of the Class Vehicles, Kia and Hyundai warranted to Plaintiff and the Class that the Class Vehicles were fit for the ordinary purpose for which they are used.

42. Plaintiff relied on this warranty to his detriment.

43. The Class Vehicles are not "merchantable" because they are not reasonably fit for

10

the ordinary purpose for which they are sold, which is to provide safe, reliable transportation. To the contrary, the Class Vehicles pose a substantial safety hazard because the Defect renders them vulnerable to theft, making them prime targets to be used as instrumentalities through which thieves engage in reckless driving or other criminal activity

44. Sufficient privity of contract exists to assert this implied warranty claim.

45. Defendants market and advertise the sale of the Class Vehicles in various media outlets across the United States, including to the Plaintiff and the Class.

46. Defendants advertise their authorized dealer network on their respective websites and task them with administering the promotional material and warranty information for new Class Vehicles to prospective consumers throughout the nation. Through Defendants' websites, consumers obtain information about vehicles; design specific vehicles to meet his or her needs; obtain information about the value of trade–in vehicles; request additional marketing materials; and request quotes for vehicle. Defendants then send these consumers to "authorized dealers" to consummate sales and leases.

47. Defendants control various details regarding their dealers' operations through various written agreements, such as: (i) granting each dealer a license to use their respective trademarks and intellectual property; (ii) furnishing each dealer with marketing materials to assist in the sale of their vehicles; (iii) providing training to dealership personnel to assist in their sales activities; and (iv) prohibiting their dealers from engaging in certain practices that otherwise detract from their respective brands or undermine the sale of their respective vehicles, including the Class Vehicles.

48. Plaintiff purchased his Vehicle from an "authorized dealer" with the understanding that these dealers were acting on behalf of Defendants.

11

49. The sole and express purpose that each authorized Kia and Hyundai dealer has when it acquires the vehicles from Kia and Hyundai is to immediately re–sell them to the end–users like Plaintiff and the Class members.

50. Defendants' conduct, and the conduct of their respective dealers, thus create a justifiable belief on the part of Plaintiff and Class members that the dealers are agents of Kia and/or Hyundai, which the Plaintiff relied on to his detriment.

51. Thus, each Kia and Hyundai dealership operates as the actual and/or apparent agent of the Defendants–manufacturers named herein, which satisfies any privity requirement.

52. Moreover, the purchase agreement between the Plaintiff and the dealer was entered directly and primarily for Kia and Hyundai's benefit.

53. Likewise, any contract whereby Defendants' authorized dealers acquire the Class Vehicles from Defendants to resell to the end–user is also for the express benefit of Plaintiff and the Class. On information and belief, Defendants' authorized dealers make little money on the actual sale or lease of new vehicles, including the Class Vehicles.

54. Plaintiff and the members of the Class therefore have standing to assert implied warranty claims against Defendants by virtue of their status as intended, third–party beneficiaries of these dealership sales agreements, which further satisfies the privity requirement.

55. Privity thus exists between Defendants on the one hand, and the Plaintiff and the Class on the other by virtue of the express warranties provided through their purchase and/or lease agreements.

56. Moreover, the Magnuson–Moss Warranty Act ("MMWA") provides that when a manufacturer offers a written warranty, it may limit the duration of an implied warranty to the duration of an express warranty, but it cannot disclaim implied warranties all together. See 15

12

U.S.C. § 2308(a) ("No supplier may disclaim or modify … any implied warranty to a consumer with respect to such consumer product if (1) such supplier makes any written warranty to the consumer with respect to such consumer Product.…"). A manufacturer should not be permitted to avoid this prohibition by claiming an ostensible lack of privity when the manufacturer itself chose its distribution model.

57. Imposing a rigid privity requirement in this case would permit Defendants to escape both the letter and spirit of the MMWA through their preferred distribution scheme; one in which the only parties in strict privity that can assert an implied warranty claim are Defendants' own dealers who would never need to assert the claim in the first instance.

58. Consequently, any rigid application of a state law privity requirement would violate the Supremacy Clause and be preempted. See U.S. Const. art. VI ("This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.").

59. As a direct and proximate result of Defendants' breach of these implied warranties, Plaintiff and the Class have suffered damages, injury in fact, and ascertainable loss in an amount to be determined at trial. These damages include, but are not limited to, overpayment for the Class Vehicles, insurance deductibles to get the stolen Class Vehicles repaired, the cost to replace other property stolen in connection with the thefts of Vehicles, the loss of use of the Vehicles, costs associated with the replacement of the totaled Class Vehicles, and/or the diminution in value of the stolen Class Vehicles that were totaled.

60. The circumstances described herein caused Defendants' exclusive or limited remedy to fail its essential purpose, such that the Plaintiff and the Class may seek alternative

13

remedies. Indeed, these warranties have denied the Plaintiff and the Class the benefit of their respective bargains, which presupposes they were (or are) able to use the Class Vehicles in a meaningful manner without the ever–present risk of them being stolen.

61. Further, Kia and Hyundai's exclusion and/or limitation of consequential damages in their New Vehicle Limited Warranties is unconscionable and void for the reasons stated above.

62. Accordingly, the Plaintiff and the Class are entitled to damages flowing from Defendants' breach of their implied warranties, as well as all consequential and incidental damages resulting from this breach.

63. Plaintiff and Class members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Defendants' conduct described herein. Affording Defendants a reasonable opportunity to cure the breach of written warranties therefore would be unnecessary and futile.

## COUNT II
## VIOLATIONS OF MAGNUSON MOSS WARRANTY ACT, 15 U.S.C. §§ 2301

64. Plaintiff repeats and realleges the preceding paragraphs as if fully set forth herein.

65. Plaintiff brings this claim on behalf of the Nationwide Class.

66. Congress enacted the MMWA, 15 U.S.C. §§ 2301 et seq., to address the widespread misuse of merchants' express warranties and to protect consumers from deceptive warranty practices. The MMWA imposes civil liability on any "warrantor" who fails to comply with any obligation under a written or corresponding implied warranty. Id. § 2310(d)(1).

67. The Class Vehicles are "consumer products" as defined in 15 U.S.C. § 2301(1).

68. Plaintiff and members of the Class are "consumers" as defined in 15 U.S.C. § 2301(3).

14

69. Kia and Hyundai are "suppliers" and "warrantors" as those terms are defined in 15 U.S.C. § 2301(4) & (5), respectively.

70. In connection with the sale and/or lease of the Class Vehicles, Defendants supplied Plaintiff and the Class with "written warranties" as that term is defined in 15 U.S.C. § 2301(6).

71. 15 U.S.C. § 2310(d)(1) provides that "a consumer who is damaged by the failure of the supplier, warrantor, or service contractor to comply with any obligation under [the MMWA], or a written warranty, implied warranty, or service contract, may bring suit for damages and other legal and equitable relief in any court of competent jurisdiction in any state."

72. 15 U.S.C. § 2301(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with an implied warranty.

73. Defendants provided Plaintiff and Class members with an implied warranty of merchantability in connection with the purchase or lease of their vehicles that is an "implied warranty" within the meaning of the Magnuson-Moss Warranty Act,

74. 15 U.S.C. § 2301(7). As a part of the implied warranty of merchantability, Defendants warranted that the Vehicles were fit for their ordinary purpose and would pass without objection in the trade as designed, manufactured, and marketed, and were adequately contained, packaged, and labeled.

75. Defendants breached its implied warranties, as described herein, and is therefore liable to Plaintiff under 15 U.S.C. § 2310(d)(1). The Defect rendered the Vehicles unmerchantable and unfit for their ordinary use of driving when they were sold or leased, and at all times thereafter.

76. Plaintiff used his Class Vehicle in a manner consistent with its intended use and performed every duty required of him under the terms of the warranty, except as may have been excused or prevented by Defendants' conduct or by operation of law.

15

Case 2:23-cv-00230-JPS   Filed 02/17/23   Page 15 of 20   Document 1

77. Plaintiff and the Class seek to recover damages resulting directly from Defendants' breach of their implied warranties and their deceitful and unlawful conduct described herein. These damages include, but are not limited to, overpayment for the Class Vehicles, insurance deductibles to get the stolen Class Vehicles repaired, the cost to replace other property stolen in connection with the thefts of their Vehicles, the loss of use of their respective Vehicles, costs associated with the replacement of the totaled Class Vehicles, and/or the diminution in value of a stolen Class Vehicles that were not totaled.

78. The MMWA also permits "other legal and equitable" relief. 15 U.S.C. § 310(d)(1). Plaintiff seeks reformation of Defendants' respective written warranties to comport with their obligations under the MMWA and with consumers' reasonable expectations. Plaintiff also seeks to enjoin Defendants from acting unlawfully as alleged herein.

79. Finally, Plaintiff intends to seek such an award as prevailing consumers at the conclusion of this case. The MMWA provides for an award of costs and expenses, including attorneys' fees, to prevailing consumers in the Court's discretion. 15 U.S.C. § 2310(d)(2).

## COUNT III
## UNJUST ENRICHMENT

80. Plaintiff repeats and realleges the preceding paragraphs as if fully set forth herein.

81. This claim is brought under California law on behalf of the Nationwide class.

82. This claim is pleaded in the alternative to any contract–based claims asserted by the Plaintiff noted above. See Fed. R. Civ. P. 8(d)(2). Moreover, a claim for unjust enrichment is properly brought where, as here, Defendants contend that their warranties do not cover damages stemming from the Defect.

83. Plaintiff bought his Vehicle directly from a Kia or Hyundai dealership.

16

84. Every year, Defendants make millions of dollars in revenue selling and leasing new and used Vehicles through their respective dealer networks across the United States.

85. Plaintiff alleges upon information and belief that consumers are not permitted to buy Vehicles directly from Defendants, but that the proceeds flow through various dealers and/or related companies (e.g., their finance companies) back to Defendants.

86. Accordingly, the purchase and lease of new Vehicles confers a direct monetary benefit on Defendants.

87. Used Vehicle purchasers also conferred a benefit on Defendants.

88. Defendants profit off the replacement parts needed to service and repair these Vehicles.

89. Further, as more used Vehicles stay in the stream of commerce, Defendants' brand awareness rises, which is of substantial value to vehicle manufacturers. Defendants have touted their vehicles as not only reliable and durable, but also as having lower depreciation rates and ownership costs over their useful lives.

90. Defendants tout these benefits to promote the sale and lease of their new cars for pecuniary benefit.

91. Accordingly, Plaintiff and the Class conferred a benefit upon Defendants, whether directly, indirectly, or through one or more affiliate entities.

92. Defendants knew and appreciated the benefits conferred upon them through the sale of the Class Vehicles to Plaintiff and members of the Class. Many of the Vehicles were financed through Kia Motor Finance or Hyundai Motor Finance.

93. Notably, federal law mandates that Kia and Hyundai maintain records of first–time purchasers of Class Vehicles, see 49 U.S.C. § 30117(b), and remain able to identify the owners of

their used cars, including the owners of certain Class Vehicles, to comply with recall notification procedures under applicable law. See id. § 30119(d)(1)(A).

94. Defendants have long represented to the consuming public that the Class Vehicles are safe, reliable, and durable even though they knew of the Defect. Not only did Defendants fail to equip the Class Vehicles with an industry standard anti–theft device, they failed to comply with FMVSS 114.

95. As a result of Defendants' wrongful conduct, unsuspecting consumers like Plaintiff and the Class overpaid for the Vehicles and incurred additional costs, thereby earning more profit.

96. Defendants continued to market the Class Vehicles despite knowing that they were unsafe and susceptible to theft, foisting the cost they would otherwise have been forced to bear through a voluntary recall or otherwise on Plaintiff and the Class.

97. Under these circumstances, it would be unjust to allow Defendants to accept and retain the benefits identified herein without paying Plaintiff and the Class them for their value.

## COUNT IV
## WIS. STAT. § 895.047: PRODUCT LIABILITY AND FAILURE TO WARN

98. Plaintiff repeats and realleges the preceding paragraphs as if fully set forth herein.

99. This claim is brought by Plaintiff individually and on behalf of the classes.

100. To the extent necessary, this claim is pled in the alternative.

101. The defective design of selling automobiles with standard shank-style keys without an engine immobilizer rendered the product unreasonably dangerous to persons or property.

102. Thousands of people have had their automobiles stolen as a direct result of the defective design.

103. Plaintiff had his automobile stolen and damaged.

104. The defective design is a cause of at least one person being killed and many more injured.

105. A reasonable alternative design, namely fitting the automobiles as standard with an engine immobilizer, which Defendants have announced they will do beginning September 2021 (Hyundai) or 2022 (Kia), exists and was available to Kia and Hyundai throughout the class period.

106. Kia and Hyundai chose to not fit their automobiles as standard with an engine immobilizer until September 2021/2022 or recall the dangerous automobiles.

107. The foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of this reasonable alternative design.

108. Defendants also failed to warn consumers of the increased risk of theft of their vehicles fitted with a shank-style key and no engine immobilizer.

109. Defendants only began warning consumers of the risk to their vehicles in July 2021 and providing free steering wheel locks in conjunction with such warning.

110. The foreseeable risks of harm posed by the product could have been reduced or avoided by the provision of the warnings that Defendants have now issued in conjunction with the Milwaukee Police Department, including to use a steering wheel lock.

## JURY DEMAND

111. Plaintiff hereby demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff request that the Court enter judgment in favor of Plaintiff and the class and against Defendant for:

    (a)    actual damages;

    (b)    statutory/liquidated damages;

(c) injunctive relief;

(d) attorneys' fees, litigation expenses and costs of suit; and

(e) such other or further relief as the Court deems proper.

Dated: February 17, 2023

**ADEMI LLP**

By: *Electronically signed by John D. Blythin*
John D. Blythin (SBN 1046105)
Jesse Fruchter (SBN 1097673)
Ben J. Slatky (SBN 1106892)
3620 East Layton Avenue
Cudahy, WI 53110
(414) 482-8000
(414) 482-8001 (fax)
jblythin@ademilaw.com
jfruchter@ademilaw.com
bslatky@ademilaw.com

20